IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WEST VIRGINIA AUTOMOBILE AND
TRUCK DEALERS ASSOCIATION,

        Plaintiff,

v.                //   CIVIL ACTION NO. 1:14CV32
                            (Judge Keeley)

FORD MOTOR COMPANY,

        Defendant.

MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS [DKT. NO. 21] AND DISMISSING CASE WITH PREJUDICE

Pending before the Court is the motion of the defendant, Ford Motor Company ("Ford"), for judgment on the pleadings (dkt. no. 21), pursuant to Fed. R. Civ. P. 12(c). For the following reasons, the Court **GRANTS** the motion and **DISMISSES** the amended complaint **WITH PREJUDICE**.

## I. BACKGROUND

Ford is an American automobile manufacturer based in Dearborn, Michigan, with dealerships worldwide. To reward loyalty to the company and to generate sales, Ford allows its dealers to participate in several discount programs known as the AXZD-Plans. Two Ford dealerships in West Virginia, Corwin Ford Sales, Inc. ("Corwin") and Bert Wolfe, Inc. d/b/a Bert Wolfe Ford ("Wolfe"), participate in the AXZD-Plans, but have become disgruntled with several of the plan terms, or Program Rules. On February 25, 2014,

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

the West Virginia Automobile and Truck Dealers Association ("WVATDA") sued Ford on behalf of Corwin and Wolfe, seeking a declaratory judgment.

**A. The AXZD-Plans**

The AXZD-Plans are discount programs for Ford employees and partners. Discounts on new Ford and Lincoln vehicles are given to Ford employees under the A-Plan, retired Ford employees or their surviving spouses under the Z-Plan, Ford dealership employees under the D-Plan, and business partner (e.g., suppliers) employees and retirees under the X-Plan. According to the Program Rules, "dealerships are encouraged, but not obligated, to participate" in the AXZD-Plans. (Dkt. No. 10-3 at 8). However, "[p]articipating dealerships agree to comply with all of the terms outlined" in the Program Rules. Id.

The Program Rules cap the document fees[1] ("doc fees") that dealers may charge at $75 for every sale under the A- or Z-Plans, and $100 for every sale under the X- or D-Plans. But because some states permit dealers to charge doc fees in excess of those amounts, the Program Rules further provide:

---

[1] A document fee is the "amount a dealer may charge a customer for processing a customer's paperwork." (Dkt. No. 10-1 at 2).

2

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

> In states that permit[] more than $75 or $100 and also
> require[] that all customers be charged the same amount,
> dealers may charge the A/Z-Plan customer $75 and X-Plan
> or D-Plan customer $100 and indicate any additional fees
> have been paid by Ford Motor Company as part of the AXZD-
> Plan Program dealer reimbursement on the buyer's order.

(Dkt. No. 10-3 at 9).

## B. Audit Violations

Notwithstanding the Program Rules, Corwin and Wolfe charged
AXZD customers $175 in doc fees – the maximum amount allowable
under West Virginia law and the same amount charged to non-AXZD
customers. After reviewing a self-audit by Corwin and a self-
assessment by Wolfe, Ford advised the dealerships to comply with
the Program Rules and refund to AXZD customers the amounts paid in
excess of the maximum allowable $75 and $100 doc fees.[2]

Corwin and Wolfe challenged the violations through Ford's
internal dispute resolution panel, the Ford Dealer Policy Board
(the "FDPB"). They argued that the maximum doc fees in the Program
Rules violated the West Virginia Consumer Credit Protection Act
("WVCCPA") by requiring the dealerships to charge different doc fee

---

[2] Although Ford initially required Wolfe to refund the overage
amounts, on appeal, Ford excused the refunds for Wolfe because only
twenty-nine AXZD customers had overpaid. (Dkt. No. 10-5 at 5). However,
it explained that future infractions would require refund payments. Id.
at 5-6.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

amounts to different customers. They further contended that informing AXZD customers that Ford had covered the difference between the $75 or $100 doc fee and the typical $175 doc fee would amount to fraudulent misrepresentation. Finally, they argued that, under West Virginia law, they could not be required to lower the doc fee amount to $75 for all customers because doing so would result in their financial detriment.

The FDPB affirmed the violations. It disagreed with the dealerships' interpretation of the WVCCPA, and articulated the statute's function as "ensur[ing] that customers who obtain a line of credit, loan or lease receive the same treatment as customers who pay with cash." (Dkt. No. 10-4 at 4). It also explained that the difference in doc fee amounts for those who are eligible to purchase vehicles under the AXZD-Plans and those who are not is not discriminatory. Finally, the FDPB told Corwin and Wolfe that, because their participation in the AXZD-Plans is voluntary, Ford does not "require" them to charge a $75 doc fee to all customers, and, even if it did, it offered them a lawful alternative by indicating to AXZD customers that the overage amount had been paid by Ford.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

## C. Litigation

Pursuant to 28 U.S.C. § 2201(a), the amended complaint of the WVATDA seeks declaratory judgment under three theories. First, the WVATDA alleges that Ford has attempted to compel Corwin and Wolfe to act "in violation of the laws and public policy of the State of West Virginia." Second, according to the amended complaint, Ford's actions interfere with the dealers' right to charge a $175 doc fee under W. Va. Code § 17A-6-1b(d), and requires dealers to violate the WVCCPA, § 46A-3-109(a)(6). Third, the WVATDA alleges that Ford's conduct violates § 17A-6A-10(d) by requiring Corwin and Wolfe to enter into a prejudicial agreement or face threats of audits or termination of their businesses. By mandating these unlawful policies, Ford allegedly will cause Corwin and Wolfe to suffer "harm and repercussions, including damages in excess of $75,000, potential law suits from consumers, loss of reputation, penalties from the State of West Virginia . . . , and potential loss of license."

As relief, the WVATDA asks the Court to enter a judgment declaring as follows:

> 1.    That Ford's policies and practices of refusing to permit the dealer to charge the $175 doc fee to individuals participating under the [AXZD-Plans]

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

               violate the public policy and laws of the State of
West Virginia[;]

2.     That Ford's policies and practices of refusing to
permit the dealer to charge the $175 doc fee to
individuals participating under the [AXZD-Plans]
violate the [WVCCPA][;]

3.     That Ford's policies and practices of refusing to
permit the dealer to charge the $175 doc fee to
individuals participating under the [AXZD-Plans]
constitute a prohibited practice under W. Va. Code
§ 17A-6A-1, et seq.[;]

4.     That [the WVATDA] be awarded the costs of [its]
prosecution of this declaratory judgment action to
include attorney fees pursuant to W. Va. Code §
17A-6A-16; and,

5.     That [the WVATDA] be granted such other and further
relief as may be determined just and proper.[3]

(Dkt. No. 10 at 10-11).

After filing an answer to the amended complaint, Ford filed a

motion for judgment on the pleadings on April 14, 2014. In its

motion, Ford argues that declaratory relief is not warranted

because the AXZD-Plans are voluntary, and thus Ford has not engaged

---

        [3] In its amended complaint, the WVATDA notes that Ford tacks on a
$275 "administrative fee" to all AXZD sales. The WVADTDA reiterated this
point during oral argument and suggested that the administrative fee
could equate to a doc fee. While the precise legal argument as to this
point is unclear, the dealers have no discretion with the administrative
fee and thus are not involved in this aspect of the transaction.
Therefore, not only does the WVATDA lack standing to raise this issue,
but the record and amended complaint are devoid of evidence connecting
the administrative fee to the doc fee, and the allegation that the two
fees are equivalent fails.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

in prohibited conduct.  Ford also argues that the WVCCPA does not apply, or, alternatively, that participation in the AXZD-Plans does not require Corwin and Wolfe to charge different doc fee amounts to different customers.  Finally, Ford argues that the WVATDA lacks standing to assert violations of either the WVCCPA or Chapter 17A, Article 6 of the West Virginia Code.

On April 24, 2014, the WVATDA countered Ford's motion by arguing that dealership participation in the AXZD-Plans is not voluntary, and that Ford's interpretation of the relevant laws is incorrect.  It also maintained that the Program Rules require Corwin and Wolfe to violate West Virginia law.  On April 28, 2014, the WVATDA filed a supplemental response, arguing that, because it attached the Ford Sales & Service Agreement (the "SSA") to its initial response, it converted Ford's motion for judgment on the pleadings into a motion for summary judgment.[4]

---

[4] Notably, the WVATDA stated in its response that "[t]here can be no dispute that [the SSA] [contains] the standard provisions that all Ford dealers in the State of West Virginia are bound by." (Dkt. No. 24 at 2 n.1).  This demonstrates the SSA's authenticity.  Moreover, in the event the Court refused to consider the SSA, the WVATDA sought leave to amend its amended complaint in order to attach the document. Id.  This demonstrates that the SSA is integral to the complaint.  Therefore, the Court will not convert Ford's motion into one for summary judgment. See Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013) ("A court may, however, consider a 'written instrument' attached as an exhibit to a pleading, 'as well as documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'") (internal

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

## II. STANDARD OF REVIEW

Rule 12(c) provides that, "[a]fter the pleadings are closed --
but early enough not to delay trial -- a party may move for
judgment on the pleadings." The standard of review for Rule 12(c)
motions is the same standard applied to Rule 12(b)(6) motions to
dismiss. See Independence News, Inc. v. City of Charlotte, 568
F.3d 148, 154 (2009). The only difference between a Rule 12(c)
motion and a Rule 12(b)(6) motion is timing. See Burbach Broad.
Co. v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002)
("Because Elkins' answer had been filed, the pleadings were closed
at the time of the motion. Thus, we construe the motion as one for
judgment on the pleadings. However, the distinction is one without
a difference, as we . . . apply[] the same standard for Rule 12(c)
motions as for motions made pursuant to Rule 12(b)(6).").

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency
of a complaint; importantly, it does not resolve contests
surrounding the facts, the merits of a claim, or the applicability
of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943,

---

citations omitted). Moreover, the Court refuses to allow the WVATDA
unilaterally to convert Ford's motion simply by attaching a document to
its responsive pleading; doing so would undermine the purpose of Rule
12(c).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

952 (4th Cir. 1992).  In reviewing the sufficiency of a complaint, a district court "'must accept as true all of the factual allegations contained in the complaint.'"  Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)).  However, while a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Indeed, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286 (1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

### III. DISCUSSION

The issues in this case are two-fold.  First, does the dealerships' compliance with the Program Rules necessarily involve unlawful conduct on their part?  Second, if so, is the unlawful conduct a direct consequence of involuntary or coerced

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

participation in the AXZD-Plans?  Before addressing these issues, the Court turns first to Ford's allegation that the WVATDA lacks standing to pursue these claims.

## A.  Standing

The Fourth Circuit recognizes three types of standing: constitutional, prudential, and statutory.  See CGM, LLC v. BellSouth Telecomms., Inc., 664 F.3d 46, 52 (4th Cir. 2011). Standing under Article III of the Constitution is not disputed here; nor does Ford contest the WVATDA's prudential standing.[5] Rather, Ford's argument focuses on whether the WVATDA possesses statutory standing to maintain causes of action under the statutes proffered in its amended complaint.

Statutory standing applies to "'legislatively-created causes of action' and concerns 'whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action.'"  CGM, 664 F.3d at 52 (quoting Radha A. Pathak, Statutory Standing and the Tyranny of Labels, 62 Okla. L. Rev. 89, 91 (2009)).  In resolving the question of whether the legislature intended to confer a right of action on the plaintiff,

---

[5] The Supreme Court's recent decision in Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1388 (2014) calls into doubt whether prudential standing remains a viable concept.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

"[o]ur task is essentially one of statutory construction." Washington-Dulles Transp., Ltd. v. Metro. Washington Airports Auth., 263 F.3d 371, 377 (4th Cir. 2001).

Ford argues that a cause of action under the WVCCPA is limited to consumers and does not extend to automobile dealer associations. Indeed, § 46A-5-101(1) provides that, "[i]f a creditor has violated the provisions of this chapter . . . , the consumer has a cause of action to recover actual damages . . . ." Courts have construed this to mean that "a plaintiff must be a 'consumer' in order to maintain a private cause of action under the WVCCPA." Ballard v. Bank of Am., N.A., No. 2:12-2496, 2013 WL 5963068, *9 (S.D.W. Va., Nov. 7, 2013).

In asserting this argument, however, Ford misapprehends the nature of this declaratory judgment action.[6] The WVATDA does not seek damages under the WVCCPA, nor has it asserted a cause of action under the WVCCPA. Rather, the WVATDA seeks a declaration of rights, pursuant to 28 U.S.C. § 2201(a), to prevent Ford from requiring its West Virginia dealerships to violate the consumer

---

[6] Notably, this is not a "good faith" action brought under 15 U.S.C. § 1222.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

rights of their customers.  Statutory standing under the WVCCPA thus presents no bar to this lawsuit.[7]

**B.  Does the Dealerships' Participation in the AXZD-Plans Necessarily Involve Unlawful Conduct?**

The WVATDA argues that, by participating in the AXZD-Plans and complying with the Program Rules, Corwin and Wolfe have no choice but to violate their customers' rights under West Virginia law.  In particular, it submits that retail purchasers of automobiles all have the right to pay the same doc fee.  Thus, if one customer pays a higher doc fee than is paid by another customer, the dealership is liable for violating the rights of the former.  According to the WVATDA, the right to pay an equal doc fee originates in two sources: the WVCCPA and guidance from the West Virginia Motor Vehicle Dealers Advisory Board (the "WVMVDAB").[8]

---

[7] Ford also argues that the WVATDA lacks statutory standing to bring a claim under Chapter 17A, Article 6, which it contends regulates the conduct of automobile dealers rather than manufacturers.  Again, however, this argument fails to grasp that the WVATDA seeks a clarification of the statutory rights vested in its members through Chapter 17A, Article 6, specifically, the right to charge customers a doc fee.  See § 17A-6-1b(d).  It has not asserted and is not pursuing an action for damages against Ford for the violation of its members' rights; it simply asks the Court to draw a bright line protecting those rights and preventing Ford's incursion on them.

[8] The WVMVDAB is a statutorily created board whose purpose, among other things, is "to advise the [Division of Motor Vehicles] commissioner on setting documentary charges or similar charges motor vehicle dealers may charge consumers for documentary services . . . ."  § 17A-6-18a(a).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

### i. WVCCPA

The purpose of the WVCCPA is to "prescribe[] maximum charges for all creditors . . . making consumer credit sales." § 46A-1-103. One of the regulated charges is doc fees: "a creditor may contract for and receive . . . [a] documentary charge or any other similar charge for documentary services in relation to securing a title, <u>so long as said charge is applied equally to cash customers and credit customers</u> . . . ." § 46A-3-109(a)(6) (emphasis added). Thus, the statute vests in credit customers the right to pay a doc fee equal to that paid by cash customers. The statue does not, as the WVATDA urges, vest in every customer the right to pay the same doc fee as every other customer.

Under the Program Rules, the method of payment is not a consideration accounted for by the prescribed doc fee charges. Instead, if Corwin and Wolfe charged disparate doc fees pursuant to the Program Rules, they would do so on the basis of whether a given customer purchases a vehicle under the AXZD-Plans. Although they would be discriminating between AXZD and non-AXZD customers, such discrimination does not fall within the ambit of the WVCCPA and its purpose. Moreover, as discussed more fully below, the dealers can avoid disparate doc fees altogether by charging all customers $75.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

### ii. WVMVDAB Guidance

On the other hand, guidance from the WVMVDAB broadly prohibits dealerships from charging any customer a higher doc fee than any other customer. According to a memorandum sent by the WVMVDAB Commissioner to West Virginia dealerships, "the same amount must be charged to every retail customer without exception and regardless of whether the transaction involves a lien or a cash sale."[9] (Dkt. No. 10-2 at 2). The parties do not dispute that Corwin and Wolfe would violate this rule by charging AXZD customers $75 or $100 and non-AXZD customers $175. Thus, the issue is whether the dealerships have a viable alternative, or are they required to engage in the unlawful practice.

### C.   Is the Dealerships' Conduct Required or Coerced?

The clear and unambiguous language of the Program Rules evinces the voluntariness of a dealership's participation in the AXZD-Plans: "dealerships are encouraged, but not obligated, to participate." (Dkt. No. 10-3 at 8). The WVATDA argues that, notwithstanding this language, the SSA and extrinsic forces coerce its members' participation. Therefore, the WVATDA concludes, the

---

[9] Notably, this mandate implicitly recognizes a group of doc fee transactions that fall outside the purview of the WVCCPA.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

Court should prohibit Ford from requiring Corwin and Wolfe to
charge doc fees less than $175 to AXZD customers.

### i. § 17A-6A-10(1)(d)

Ford contends that nothing prevents Corwin and Wolfe from
simply charging all customers a $75 doc fee. Although § 17A-6-
1b(d) provides that a doc fee up to $175 "may be charged by a motor
vehicle dealer," guidance from the WVMVDAB confirms that dealers
are "not required to charge a documentary fee or charge the maximum
allowable documentary fee." (Dkt. No. 10-2 at 2). Thus, Corwin
and Wolfe could charge a $75 doc fee to all its customers under
West Virginia law.

Charging a $75 doc fee to all customers, however, would result
in a significant financial loss to the dealerships. (Dkt. No. 10-4
at 3) (explaining that an across-the-board $75 doc fee would have
cost Corwin $30,000 in 2012); (Dkt. No. 10-5 at 3) (explaining that
refunding doc fee charges in excess of $75 to all customers would
have cost Wolfe $317,000 in 2012). And, under West Virginia law,

> [a] manufacturer or distributor may not require any new
> motor vehicle dealer in this state to . . . [e]nter into
> any agreement with the manufacturer or distributor or do
> any other act prejudicial to the new motor vehicle dealer
> by threatening to terminate a dealer agreement, limit
> inventory, invoke sales and service warranty or other
> types of audits or any contractual agreement or

15

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

> understanding existing between the dealer and the manufacturer or distributor.

§ 17A-6A-10(1)(d).

The WVATDA's interpretation of this statute emphasizes the word "any" in an effort to mitigate the distinction between dealerships that participate in the AXZD-Plans and those that do not. While the WVATDA's point is well-taken, it fails to address the <u>a priori</u> issue, which is whether Ford "requires" any of its dealerships to act adversely to the dealership's own interests by charging all customers a $75 doc fee.

The word "require" contemplates a lack of consent by the dealers to engage in the ostensibly forced conduct. By electing to participate in the AXZD-Plans, however, Corwin and Wolfe expressly agreed to the following:

> Dealers will be permitted to assess up to $75 in documentary fees on each A/Z-Plan delivery and up to $100 in documentary fees on each X-Plan and D-Plan delivery to an eligible purchaser under the terms of the plan <u>unless otherwise provided by state or local laws or regulation. Each dealer is responsible for complying with applicable laws or regulations.</u>

(Dkt. No. 10-3 at 9) (emphasis added). West Virginia law requires that all customers are charged the same doc fee, and thus, under the Program Rules agreed to by the dealers, they were responsible for ensuring compliance with that law. Moreover, they consented to

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

bearing this responsibility when they opted into the AXZD-Plans, and their continued consent is evidenced by their refusal to opt out.  Therefore, Ford has not required Corwin and Wolfe to engage in any conduct or business practice to which the dealerships did not previously agree.

At bottom, compliance with the Program Rules mandates compliance with West Virginia law, and the responsibility of compliance in both respects falls on the shoulders of the dealers. Despite the WVATDA's argument that dual-compliance is impossible, a $75 charge is an obvious point of intersection between the doc fee amounts permitted under the Program Rules and the amount permitted under West Virginia law.  While the Program Rules do not explicitly spell this out, the dealers bore the responsibility of recognizing and applying it.  Their failure to do so has inevitably led to their current dilemma of either refusing to follow Ford's mandate to refund overage amounts, or violating West Virginia law by charging customers different doc fees.  Despite the WVATDA's urging, the Court will not impute the dealers' compliance failures to Ford.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

### ii. SSA

The WVATDA points to language from the SSA's "Other Dealer and Company Responsibilities: Customer Handling" section, which provides that "[t]he Dealer shall cooperate with Company programs." (Dkt. No. 23-1 at 12). It argues that a dealer's refusal to participate in the AXZD-Plans would amount to an infraction of the SSA's "cooperation" requirement. Ford, however, articulates that it would not hold its dealers liable for breach of the SSA in the event they declined to participate in the AXZD-Plans. (Dkt. No. 26 at 3). Ford's position leaves no room for the Court's declaration of the dealerships' rights in this regard. Going forward, it is clear that Corwin and Wolfe may participate in the AXZD-Plans without facing the threat of litigation or sanctions by Ford relative to the SSA's cooperation requirement.

Even if this were a claim for past conduct rather than a claim for prospective relief resolved by a mutual understanding, the specific language from the Program Rules trumps the general "cooperation" language from the SSA. See Aetna Cas. & Sur. Co. v. Holsten, 100 F.3d 950, *3 (4th Cir. 1996) (unpublished decision) ("[W]hen interpreting a contract, a court should follow the interpretive philosophy that specific language trumps general

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

text.") (citing <u>United States v. Marietta Mfg. Co.</u>, 339 F. Supp. 18, 27 (S.D.W. Va. 1972)).

The WVATDA's proposed interpretation of "cooperation" would render meaningless the Program Rules' statement that "dealerships are encouraged, but not obligated, to participate." Furthermore, because all dealerships would be participants in the AXZD-Plans by virtue of the SSA, the Program Rules' warning that "<u>[p]articipating dealerships</u> agree to comply with all of the terms outlined in this document" would make no sense. (Dkt. No. 10-3 at 8) (emphasis added). The Court is not inclined to depart from the long-held principle of <u>ejusdem generis</u> by stripping the specific language in the Program Rules of meaning. <u>See</u> <u>CSX Transp., Inc. v. Alabama Dep't of Revenue</u>, 131 S. Ct. 1101, 1113 (2011) ("We typically use <u>ejusdem generis</u> to ensure that general words will not render specific words meaningless.").

### iii. Market Forces

Still, the WVATDA argues that, because the customer base eligible to purchase a vehicle under the AXZD-Plans is so extensive, "the dealer has no reasonable financial choice but to participate." Such a claim must be substantiated by factual support. A review of the amended complaint, however, reveals

nothing that would allow the Court to evaluate the merits of the WVATDA's argument.  For example, it does not provide its members' AXZD sales as a percentage of gross sales.  Nor does it state the anticipated loss of revenue to its members were they to opt out of the AXZD-Plans.  Without more, the Court must reject the WVATDA's bald assertion that the market requires its dealers' participation.[10]

Having determined that dealer participation in the AXZD-Plans is voluntary, Ford cannot, by the terms of the statute, stand in violation of § 17A-6A-10(1)(d).  Thus, the Court finds no merit in the WVATDA's argument that audits by the FDPB under the guise of the Program Rules constitute a coercive threat to Corwin and Wolfe, forcing them to act prejudicially to their businesses by either refunding excessive doc fee amounts to customers or charging all customers a $75 doc fee.  Corwin and Wolfe are well within their rights under West Virginia law and the Program Rules to opt out of

---

[10] Market forces are generally insufficient to convert an otherwise voluntary vehicle purchase program into a mandatory vehicle purchase program.  See Long-Lewis Sterling W. Star of Bessemer v. Sterling Truck Corp., 460 Fed. App'x 819, 820 (11th Cir. 2012) ("[W]e conclude that the buy-one-to-get-one program was not coercive because Long-Lewis voluntarily participated in the program and presented no evidence of any force, threat, or pressure (other than mere market forces) to participate in the program.").

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

the AXZD-Plans, and neither the SSA nor the automobile market precludes them from doing so.

**D. Fraudulent Misrepresentation Under the Program Rules**

The only remaining issue is whether Ford requires dealers who have chosen to participate in the AXZD-Plans to engage in a fraudulent business practice.  The Program Rules provide as follows:

> <u>Unless otherwise provided by state or local laws or regulations</u>: . . . In states that permit[] more than $75 or $100 and also require[] that all customers be charged the same amount, dealers <u>may</u> charge the A/Z-Plan customer $75 and the X-Plan or D-Plan customer $100 and indicate any additional fees have been paid by Ford Motor Company as part of the AXZD-Plan Program dealer reimbursement on the buyer's order.

(Dkt. No. 10-3 at 9) (emphasis added).

The WVATDA argues that this language "require[s] dealers to misrepresent the amount and source of the funds expended to pay for doc fees for customers buying under [the AXZD-Plans]" and that "[b]y law dealers in the state of West Virginia are required to disclose the dollar amount of any documentary fees that are being charged."[11]  (Dkt. No. 24 at 7).  According to the WVATDA, by

---

[11] Invoking even stronger terms, the WVATDA also states that "Ford force[s] the dealers who sell under its program rules to commit fraud." (Dkt. No. 24 at 12).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

complying with this purported requirement, dealers are subject to "claims of consumer fraud, fines from the Attorney General or loss of their dealer license."  <u>Id.</u>

The WVATDA's argument lacks merit for a couple of reasons. First, the allegedly unlawful practice is not a requirement of participation in the AXZD-Plans.  The plain language of the Program Rules - "dealers <u>may</u> . . . indicate . . ." - demonstrates the permissiveness of this option.  If dealers perceive a threat, legal or otherwise, as a consequence of representing to AXZD customers that Ford has covered the overage doc fee amount, then, as previously established, they may charge all customers $75.  Second, and of greater importance, Ford clearly expresses that AXZD dealers may only engage in this business practice if state and local laws permit it.  Thus, to the extent the WVATDA is correct that West Virginia law prohibits the practice, then, under the clear terms of the Program Rules, Ford likewise prohibits it.

Finally, the WVATDA desperately attempts to create a justiciable controversy as to whether the business practice discussed above amounts to fraudulent misrepresentation.  However, that is not an issue in this case.  Neither Corwin nor Wolfe has actually employed the practice of falsely telling AXZD customers

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

that Ford covered the additional doc fee amount.  Thus, the tort of fraudulent misrepresentation has not occurred.  Even if it had, Corwin and Wolfe would be the tortfeasors and, as such, would lack standing to assert a fraudulent misrepresentation cause of action against Ford.[12]  Therefore, a judicial decision in this regard at this time would constitute an impermissible advisory opinion.  See Golden v. Zwickler, 394 U.S. 103, 108 (1969) ("The federal courts established pursuant to Article III of the Constitution do not render advisory opinions. . . . This is as true of declaratory judgments as any other field.") (internal quotation marks and citations omitted); see also 28 U.S.C. § 2201(a) (limiting a federal court's declaratory judgment authority to "case[s] of actual controversy").

## IV. CONCLUSION

Neither Ford, the Program Rules, the SSA, the automobile market, nor any other external forces require dealership participation in the AXZD-Plans.  As obligatory participation is a prerequisite to a manufacturer's violation of § 17A-6A-10(1)(d), no violation has occurred and a declaration of the dealerships' rights

---

[12] Presumably, however, they could assert a third-party claim against Ford in the event they were sued.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

under that statute is unnecessary.  With respect to the WVCCPA, it is simply not implicated in this case; even if it were, however, dealerships could avoid violating it by charging a $75 doc fee to all customers.

Moreover, because the dealers are free to opt out of the AXZD-Plans and charge all customers a $175 doc fee, or participate in the AXZD-Plans and charge all customers a $75 doc fee, Ford has not forced them to violate the WVMVDAB's mandate that all customers be charged the same amount.  Finally, the Court declines the WVATDA's invitation to opine on whether advising customers that Ford has covered the overage doc fee amount constitutes fraudulent misrepresentation.

In sum, finding that the Program Rules do not violate the public policy and laws of West Virginia, the WVCCPA, or § 17A-6A-10(1)(d), for the reasons discussed, the Court **GRANTS** Ford's motion for judgment on the pleadings and **DISMISSES** the WVATDA's amended complaint **WITH PREJUDICE.**

It is so **ORDERED.**

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DISMISSING CASE WITH PREJUDICE**

---

The Court directs the Clerk to transmit copies of this Memorandum Opinion and Order to counsel of record, and to enter a separate judgment order.

DATED: May 30, 2014.

                              /s/ Irene M. Keeley
                              IRENE M. KEELEY
                              UNITED STATES DISTRICT JUDGE